UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil Action No. 15 Civ. |
| Plaintiff, | COMPLAINT |
| v. | |
| EVA D'ONOFRIO, | |
| Defendant. | |

Plaintiff International Business Machines Corporation ("IBM" or "Plaintiff"), by

its attorneys Jackson Lewis P.C., for its Complaint against Eva D'Onofrio ("D'Onofrio" or

"Defendant"), states as follows:

## A. Nature of the Action

1. IBM brings this action for monies due and owing to IBM by Defendant,

pursuant to the terms of the IBM Long-Term Performance Plan (the "Plan" or "LTPP").

2. During all relevant times herein, D'Onofrio was a participant in the LTPP

under which D'Onofrio received equity awards, which would be subject to cancellation and

rescission if D'Onofrio engaged in detrimental activity under the Plan or failed to comply with

the terms and conditions of the Plan, her Equity Award Agreements ("EAAs"), or her

Noncompetition Agreement ("NCA").

3. D'Onofrio forfeited her right to retain the monetary benefits of her equity

awards when she voluntarily resigned from IBM Italia SpA ("IBM Italy") on or about December

30, 2013, and then went to work for Microsoft Corporation ("Microsoft"), a direct competitor of

IBM Italy, as the General Manager Services of Western Europe in or about April 2014.

4. IBM brings this action for monies due and owing to IBM by Defendant.

## B. The Parties

5.   IBM is a corporation organized under the laws of the State of New York with its principal place of business located in Armonk, New York, within the Southern District of New York.

6.   IBM Italy is an indirect subsidiary of IBM.

7.   D'Onofrio is an individual and a former employee of IBM Italy.

8.   D'Onofrio was employed by IBM Italy in its Global Technology Services Division.

9.   IBM Italy hired D'Onofrio on December 14, 1987.

10.   During her long history of employment at IBM Italy, D'Onofrio received numerous promotions and pay raises and became a high level, highly compensated executive.

11.   After 26 years of employment at IBM Italy, D'Onofrio voluntarily resigned from her position. Shortly after her voluntary resignation from IBM Italy, D'Onofrio became employed by Microsoft, a direct competitor of IBM Italy.

12.   Upon information and belief, D'Onofrio resides in Roma, Italy.

## C. Jurisdiction and Venue

13.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.

14.   This Court has personal jurisdiction over D'Onofrio pursuant to the parties' agreement contained in both the LTTP and Terms and Conditions of Your Equity Award: Effective June 8, 2013 ("Equity Award Terms and Conditions").

15.   Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 because IBM's headquarters and principal place of business are situated within this judicial district.

16.     Venue also properly lies in this Court pursuant to the parties' agreement contained in both the LTPP and Equity Award Terms and Conditions.

**D. The LTPP**

17.     The LTPP is designed to attract, motivate and retain selected employees of the Company (defined by the LTPP as "IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries and partnerships and other business ventures in which IBM has an equity interest") (hereinafter within this section referred to as the "Company"). These objectives are accomplished by making long-term incentive and other awards under the Plan, thereby providing participants with a proprietary interest in the growth and performance of the Company.

18.     Section 13(a) of the LTPP provides, in pertinent part:

Unless the Award Agreement specifies otherwise, the Committee may cancel, rescind, suspend, withhold or otherwise limit or restrict any unexpired, unpaid, or deferred Awards at any time if the Participant is not in compliance with all applicable provisions of the Award Agreement and the Plan, or if the Participant engages in any 'Detrimental Activity.' For purposes of this Section 13, 'Detrimental Activity' shall include: (i) the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interest of the Company... (v) a violation of any rules, policies, procedures or guidelines of the Company, including but not limited to the Company's Business Conduct Guidelines... [and] (viii) any other conduct or act determined to be injurious, detrimental or prejudicial to any interest of the Company.

19.     Section 13(b) of the LTPP provides, in pertinent part:

Upon exercise, payment or delivery pursuant to an Award, the Participant shall certify in a manner acceptable to the Company that she or she is in compliance with the terms and conditions of the Plan. In the event a Participant fails to comply with the [Detrimental Activity] provisions...of this Section 13 prior to, or during the Rescission Period, then any exercise, payment or delivery may be rescinded within two years after such exercise payment or delivery. In the event of any such rescission, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of the rescinded exercise, payment or delivery, in such manner and on such terms and conditions as may be

3

required, and the Company shall be entitled to set-off against the amount of any such gain any amount owed to the Participant by the Company. As used herein, Rescission Period shall mean that period of time established by the Committee which shall not be less than 6 months after any exercise, payment or delivery pursuant to an Award.

20.    Section 15(f) of the LTPP provides in pertinent part:

In the event that a Participant or the Company brings an action to enforce the terms of the Plan or any Award Agreement and the Company prevails, the Participant shall pay all costs and expenses incurred by the Company in connection with that action, including reasonable attorneys' fees, and all further costs and fees, including reasonable attorneys' fees incurred by the Company in connection with collection.

21.    Section 15(e) of the LTPP states that it is governed by New York law and that "recipients of an Award under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve any and all issues that may arise out of or relate to the Plan or any related Award Agreement."

E.  **IBM's Grant of Equity Awards to D'Onofrio**

22.    On or about June 8, 2009, IBM granted D'Onofrio an Equity Award comprised of 556 shares of RSUs. 139 shares were scheduled to vest on June 8, 2010, June 8, 2011, June 8, 2012, and June 8, 2013.

23.    On or about June 8, 2010, IBM granted D'Onofrio an Equity Award comprised of 529 shares of RSUs.  132 shares were scheduled to vest on June 8, 2011, June 8, 2012, and June 8, 2013. 133 shares were scheduled to vest on June 8, 2014.

24.    On or about June 8, 2011, IBM granted D'Onofrio an Equity Award comprised of 458 shares of RSUs. 114 shares were scheduled to vest on June 8, 2012, June 8, 2013, and June 8, 2014. 116 shares were scheduled to vest on June 8, 2015.

25.    On or about June 8, 2012, IBM granted D'Onofrio an Equity Award comprised of 500 shares of RSUs. 125 shares were scheduled to vest on June 8, 2013, June 8,

2014, June 8, 2015, and June 8, 2016.

26.   IBM's grants to D'Onofrio became effective after and were conditioned upon her accepting the terms and conditions of (a) the LTPP under which these long term incentive awards were granted, (b) the EAAs, and (c) the accompanying Equity Award Terms and Conditions, including those provisions of the foregoing related to the cancellation and rescission of equity awards.

## F.   The EAAs

27.   D'Onofrio was required to sign EAAs in order to receive each Equity Award grant.

28.   Each EAA provides:

> IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period.  You understand that the Rescission Period that has been established is 12 months.

29.   The EAAs pertaining to RSUs also stipulates that D'Onofrio's "participation in the [LTPP was] voluntary."

30.   The EAA states that it, along with the Equity Award Terms and Conditions document and the LTPP, which are collectively "incorporated [to the EAA] by reference…, constitute the entire agreement between [D'Onofrio] and IBM with respect to [her] Award."

## G.   The Equity Award Terms and Conditions

31.   The Equity Award Terms and Conditions between D'Onofrio and the Company (defined by the Equity Award Terms and Conditions of Employment as "IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries and partnerships and other business ventures in which IBM has an equity interest"), which apply to D'Onofrio's Equity

5

Awards currently subject to rescission, state, in pertinent part:

> All determinations regarding enforcement, waiver or modification of the cancellation and rescission and other provisions of the Plan and your Equity Award Agreement...shall be made in IBM's sole discretion. Determinations made under your Equity Award agreement and the Plan need not be uniform and may be made selectively among individuals, whether or not such individuals are similarly situated.

32.    The Equity Award Terms and Conditions also state, in pertinent part:

> You agree that the cancellation and rescission provisions of the Plan and your Equity Award Agreement are reasonable and agree not to challenge the reasonableness of such provisions, even where forfeiture of your Award is the penalty for violation.

33.    The Equity Award Agreement Terms and Conditions specify that each EAA is governed by New York law and that recipients "submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve all issues that may arise out of or relate to [an] Equity Award Agreement."

## H.  The NCA

34.    In recognition of her critical role as a senior executive at IBM Italy, and as consideration for being promoted to a senior executive position, any and all awards granted to her under the Plan, and for other good and valuable consideration, D'Onofrio agreed to the terms and conditions of a NCA executed on July 7, 2009.

35.    The NCA provided that if D'Onofrio:

> engage[d] in conduct in breach of this Agreement prior to, or within twelve (12) months after, any delivery or payout pursuant to any LTPP Awards, then such conduct shall also be deemed to be a breach of the terms of such LTPP Awards, justifying cancellation or rescission of any such LTPP Awards. (NCA § 5.)

36.    In the NCA, D'Onofrio acknowledged and agreed:

> during [her] employment with IBM and for twelve (12) months following the termination of [her] employment . . . , [she] will not directly or indirectly within the "Restricted Area" (i) "Engage in or Associate with" (a) any "Business

6

Enterprise" or (b) any competitor of the Company (defined by the NCA as "International Business Machines Corporation and its affiliates) (hereinafter within this section referred to as the "Company") . . . . (Id. § 1(c).)

      37.     The NCA provides the following definitions for the defined terms used in

Section 1(c):

    (a)     "Restricted Area" is defined as "any geographic area in the world for which [D'Onofrio] had job responsibilities during the last twelve (12) months of [her] employment with IBM." (Id. § 2(d).)

    (b)     "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, contractor or otherwise." (Id. § 2(c).)

    (c)     "Business Enterprise" is defined as "any entity that engages in . . . competition with any business units or divisions of the Company in which [D'Onofrio] worked at any time during the three (3) year period prior to the termination of [her] employment." (Id. § 2(a).)

      38.     Thus, D'Onofrio agreed in the NCA that, for a period of one year following the termination of her employment from IBM Italy she would not (1) work for any competitor of IBM, or (2) work for any company that engages in competition with any business unit or division of IBM in which she worked in the last three years.

      39.     Further, in the NCA, D'Onofrio made several other important representations and acknowledgments, including:

    (a)     "the business in which [the Company is] engaged is intensely competitive" (Id. § 1(a).);

    (b)     her "employment by IBM has require[d]... that [she] have access to, and knowledge of, confidential information of the Company, including, but not limited to, certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business" (Id.);

    (c)     her "services to the Company are, and will continue to be, extraordinary, special and unique" (Id.);

(d)     "the Company would suffer irreparable harm if [she failed] to comply with [the noncompetition…covenants]" (Id. § 3.); and

(e)     "the restrictions set forth in [the covenants] are reasonable as to geography, duration and global scope." (Id.)

## I.   D'Onofrio's Equity Award Gains Subject to Rescission

40.     On or about June 8, 2013, 139 of the RSUs awarded to D'Onofrio on June 8, 2009 vested and were released into D'Onofrio's Morgan Stanley Smith Barney account. The value of these RSUs as of on or about June 8, 2013 was $28,526.97.

41.     On or about June 8, 2013, 132 of the RSUs awarded to D'Onofrio on June 8, 2010 vested and were released into D'Onofrio's Morgan Stanley Smith Barney account. The value of these RSUs as of on or about June 8, 2013 was $27,090.36.

42.     On or about June 8, 2013, 114 of the RSUs awarded to D'Onofrio on June 8, 2011 vested and were released into D'Onofrio's Morgan Stanley Smith Barney account. The value of these RSUs as of on or about June 8, 2013 was $23,396.22.

43.     On or about June 8, 2013, 125 of the RSUs awarded to D'Onofrio on June 8, 2012 vested and were released into D'Onofrio's Morgan Stanley Smith Barney account. The value of these RSUs as of on or about June 8, 2013 was $25,653.75.

44.     D'Onofrio gained a total of $104,667.30 in Equity Awards, as described in Paragraphs 40-43, that is now subject to rescission.

## COUNT I— Breach of Terms of Equity Awards

45.     IBM repeats and realleges each and every allegation contained in Paragraphs "1" through "44" of the Complaint, with the same force and effect as set forth herein at length.

46.     On or about December 30, 2013, D'Onofrio voluntarily resigned from IBM Italy.

47.     Shortly thereafter, IBM learned that D'Onofrio commenced employment with Microsoft.

48.     D'Onofrio had previously acknowledged that, pursuant to the LTPP and NCA, if she chose to join a competitor of IBM within the Rescission Periods, as defined in the EAAs, her awards issued under the LTPP would be forfeited.

49.     D'Onofrio's employment with Microsoft qualifies as "Detrimental Activity" as that term is defined under Section 13(a)(i), (v), and (viii) of the LTPP entitling IBM to seek rescission of D'Onofrio's Equity Awards she gained during the 12 month period prior to accepting a job at Microsoft.

50.     On September 22, 2014, IBM sent D'Onofrio a letter advising D'Onofrio that becoming employed by Microsoft entitled IBM to rescind D'Onofrio's Equity Awards totaling $104,667.30.

51.     IBM's September 22, 2014 letter directed D'Onofrio to repay IBM by October 24, 2014.

52.     D'Onofrio has failed to remit payment to IBM despite this September 22, 2014 demand.

53.     D'Onofrio owes IBM $104,667.30.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff IBM demands judgment in its favor and against D'Onofrio as follows:

1.    Payment by D'Onofrio to IBM of a sum not less than $104,667.30, together with interest;

2.    Awarding IBM its attorneys' fees, costs, and disbursements incurred as a result of this action; and

3.    Awarding IBM such other and further relief as the Court deems just and proper.

Respectfully submitted,

JACKSON LEWIS P.C.
666 Third Avenue
New York, New York 10017
(212) 545-4000

Dated: January 30, 2015          By: _____
New York, NY                          Kevin G. Lauri (KL 8714)
                                      Dana G. Weisbrod (DW 0527)
                                      Daniel D. Schudroff (DS 0525)

ATTORNEYS FOR PLAINTIFF
INTERNATIONAL BUSINESS MACHINES
CORPORATION

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION<br><br>*Plaintiff*<br><br>v.<br>EVA D'ONOFRIO<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

**15 CV 682**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Eva D'Onofrio
Via Aurelio Galleppini, 35
Roma
RM
00127 Italy

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Kevin G. Lauri, Dana G. Weisbrod, and Daniel D. Schudroff
Jackson Lewis P.C.
666 Third Avenue, 29th Floor
New York, New York 10017

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

CLERK OF COURT

Date: _____01/30/2015_____     _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc: